

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CIVIL ACTION NUMBERS: Consolidated |
| VERSUS | * | |
| | | (CRIMINAL NO. 00-171) |
| JOHN HERRING a/k/a JOHN MORRIS HERRING, SR., MARTHA SEWELL a/k/a MARTHA HE RRING, ET AL | * | SECTION: "K" (3) |
| | * | |
| * | * | * |

**GOVERNMENT'S OPPOSITION TO JOHN AND MARTHA HERRINGS MOTIONS TO VACATE, SET ASIDE, AND TO CORRECT, MODIFY, RESENTENCE OR SET FOR NEW TRIAL PURSUANT TO TITLE 28, UNITED STATE CODE, SECTION 2255**

**MAY IT PLEASE THE COURT**:

### FACTS[1]

John and Martha Herring were charged and convicted of violating 18 U.S.C. §§ 371 (conspiracy), 664 (theft from pension plans), 1347 (health care fraud), and 157(1) and (2)(bankruptcy fraud). Martha Herring was charged and convicted of two additional counts of bankruptcy fraud in violation of 18 U.S.C. §§ 157(1) and (2). The Herrings' affiliated entities, Home Care Center, Inc. ("HCC"), Southern Style Success, Inc. ("SSS, Inc."), Success Southern Style, L.L.C. ("SSS, LLC"), Golden Goose Enterprises, Inc. ("the Goose"), and Goldco

---

[1]These facts were restated verbatim as they appear in <u>United States v. John Herring and Martha Sewell</u>, No. 02-30533 (5th Cir. July 17, 2003).

International, Ltd. ("Goldco"), were also charged with conspiracy. Most of the charges relate to the Herrings' ownership of a chain of home health agencies in Louisiana - Golden Age of Baton Rouge, Golden Age of Shreveport, Golden Age of Monroe, Golden Age of Houma and Golden Age of the South (located in Hammond) (collectively, the "Agencies"). HCC served as the Agencies' home office and was owned by and employed the Herrings.

The Agencies served mainly Medicare patients. To obtain reimbursement from Medicare, at the end of each fiscal year, a cost report was prepared by each Agency and submitted to Medicare. Under the reporting procedure, all costs associated with running the Agencies are included on the reports, but Medicare reimburses only those costs that are reasonable, necessary and related to patient care. Employee benefits such as pension plans, paid days off and bonuses, and certain employee appreciation expenditures are costs allowed by Medicare. The cost reports are used to derive pay rates for different care services. Services are then billed to Medicare at those rates. When Medicare pays for patient care visits, it is reimbursing the Agencies for allowable expenses submitted on the cost reports. Some costs are allowed to be accrued and listed as debts on the cost report, including paid days off, retropay and pension plan contributions. Medicare allows the Agencies one year from the end of the reporting year to pay these debts unless the Agency provides an acceptable reason for an extension. All funds collected from Medicare are destined to be paid out for approved expenses. The Agencies were thus all non-profit ventures.

HCC provided administrative and management services to the Agencies. HCC's operating costs were allocated to the individual Agencies. Before allocation, HCC subtracted the costs of services provided to related entities which did not provide patient related services from its cost report because Medicare does not pay for non-patient related services. In addition to

2

serving the Agencies, HCC served SSS, Inc., the Goose, Goldco and SSS, LLC. SSS, Inc was a real estate holding company which purchased property to rent to the Agencies. Goldco was a consulting business that was designed to be a cash generating business. The Herrings billed it as offering expertise in all things related to Medicare and home health agencies. The Goose, another profit seeking venture, was a day care center providing Medicare-reimbursed services as benefits to employees of the Baton Rouge agency and HCC.

The Herrings created pension plans for the Agencies and HCC. The plans were purchased between 1990 and 1992 from Pension Administrators & Consultants, a company headed by Dwight Cenac. Cenac marketed the plans as having the benefit that employers could borrow from the plan assets. That position might be defensible in some circumstances under Medicare regulations, but did not consider ERISA rules. In the fall of 1992, Chris Uhland, one of Cenac's accountants determined that ERISA did apply to the plans and prohibited the loans. Cenac testified that he had his company send a "Client Alert" regarding the matter to all of his pension clients, including the Agencies, in October 1992. Uhland testified that on December 1, 1992, he mailed or faxed a letter to the Herrings in which he repeated this information. The Herrings claim that they never received this information. They testified that they learned of the possible prohibition of these loans under ERISA regulations in September 1994, when, after firing Cenac's company, their new accountants investigated the situation and concluded that the plans were covered by ERISA and that ERISA regulations prohibited loans to the employers without the approval of the Department of Labor.

Prior to September 1994, the Herrings directed that contributions be made to the pension plans. They also caused their related businesses to borrow money from the various pension plans in the following series of transactions:

3

(1) In 1992, SSS, Inc. purchased property in Houma, Louisiana for $200,000 with bank financing. Certificates of deposit owned by three agency pension plans were pledged as collateral for the loan.

(2) Shortly thereafter, HCC funded the down-payment on property in Sherwood Forest in Baton Rouge. The purchase price was paid with $368,000 from the Monroe Agency which had been earmarked to fund the pension plan and pay other accrued debts.

(3) SSS, Inc. renovated a floor of the Sherwood Forest property as a conference facility for Goldco. HCC deposited Medicare funds into various plan accounts. The funds were then transferred to SSS, Inc., which paid the contractor.

(4) In 1993, SSS, Inc. purchased a building in Bastrop for $87,000. The Herrings caused the pension plans to be funded, then transferred funds to SSS, Inc. which paid for the building.

(5) Also in 1993, SSS, Inc. purchased a building in Monroe for $200,000 with a $25,000 deposit. The deposit came from funds funded into a pension plan and then transferred to SSS, Inc.

(6) In 1994, SSS, Inc. purchased two lots near the Sherwood Forest building for $49,000 to build a facility for the Goose. Funding came from HCC to one of the pension plans and then to SSS, Inc.

In simple terms, when the Herrings wished to purchase property for the use of the Agencies or their related for-profit businesses, they would transfer funds due to the pension plans from the Agencies or HCC (which held Agency funds) into the plan accounts and then immediately withdraw the funds from the plans to purchase property or pay for improvements. The pension plans were granted secured mortgages on most of the properties purchased with plan funds.

In December 1993, to raise additional funds for the Goose, the Herrings had the pension plans funded and then had the funds purchase $250,000 in Goose preferred stock. In June 1994, this process was repeated and the funds used to purchase an additional $250,000 in Goose preferred stock.

At the urging of Harvey Rennhoff, then HCC director of operations who was concerned about the loans, the Herrings pledged all of their stock in SSS, Inc., the Goose, Goldco and HCC and the Agencies to the pension plans. The plan trustees were not aware of the pledge. They learned of it when the Herrings later altered the agreement to substitute newly created SSS, LLC units for stock of SSS, Inc.

At the end of 1995, it was time to pay the 1994 accrued liability to the pension plans. The Herrings filed for an extension claiming Medicare-related cash flow problems. Two months later in February 1996, the Herrings withdrew $500,000 from HCC and deposited it in SSS, Inc., which used the funds to make a partial payment on a house on Highland Road for the Herrings. The total purchase price was approximately $1.2 million. In June 1996, John Herring directed HCC to transfer funds to SSS, Inc. to cover the balance of the purchase price. Since the Agencies are non-profit businesses, every dollar that the Herrings withdrew reduced the funds available to pay the costs of the Agencies.

To pay the pension funds owed, the Herrings discounted the Agencies' Medicare receivables with Healthcare Capital Resources. At the end of 1996, the pension plan liability was paid for 1994 but extended for 1995. At the end of 1997, Medicare denied a request for an extension to pay the 1996 pension debt because the Agencies had misdirected available funds to related third parties.

At trial, the government presented evidence that the Herrings used Agency funds for first class travel, expensive dinners, and personal expenses. A Medicare audit resulted in some of these expenses being disallowed. By the time of the audit and disallowance, the Agencies had already been reimbursed. As a result, the government withheld the disallowed amounts from future reimbursements. This led to cash flow problems which caused the Herrings to put the Golden Age Agencies into Chapter 11 bankruptcy.

At the time of the bankruptcy, the Herrings, Goldco and the Goose owed the Agencies significant amounts of money. Herring refinanced the Highland Road house but it is not clear if any of the funds went to the Agencies. Funds due from the Herrings, Goldco and the Goose were not disclosed as assets on the Agencies' bankruptcy schedules.

The Herrings found a buyer for the Agencies and HCC. The buyer required that the pledges against the Agencies' stock in favor of the pension plans be released. The Herrings caused the pledges to be released without replacing the stock with any other security. They received employment contracts with the buyers.

Martha Herring anticipated having to file for personal bankruptcy due to lingering debts related to her prior ownership of a New Orleans area home health agency. In an attempt to protect a house she owned in Pass Christian, Mississippi, she donated it to an LLC she created in her son's and daughter's names. She testified that her attorney had advised her that property transferred more than one year prior to filing bankruptcy would be excluded from the bankruptcy estate. The LLC was created in May 1995. The organization documents for the LLC included Martha Herring as a member of the LLC, although her intent was that only her children be members. The LLC documents were later amended to remove her as a member on October 8, 1995. The Pass Christian property was donated to the LLC by a document executed on June 8,

1995, but recorded June 23, 1995. Although listed as a member of the LLC, her son had no knowledge of his membership interest in the LLC or the donation. Martha Herring filed for bankruptcy on June 21, 1995, short of the one-year period from the recordation of the property transfer. Martha Herring did not list the Mississippi property as an asset on her schedule of assets filed in her bankruptcy petition.

As a result of their convictions, the Herrings were sentenced to 84 months imprisonment on the health care fraud count and to 60 months imprisonment on each of the other counts to be served concurrently. They were each ordered to pay restitution to Stanford Trust, the fiduciary for the Agencies' pension plans, in the amount of $4,390,832, Home Care Center Pension Plan in the amount of $970,761, Medicare in the amount of $405,738, and Healthcare Capital Resources in the amount of $1,856,895. The Herrings timely appealed.

## ARGUMENT

I. **PETITIONERS RECEIVED SENTENCES SUPPORTED FULLY BY THE INDICTMENT AND THE JURY VERDICT**

In making their motion, petitioners rely on the recent Supreme Court decision in Apprendi v. New Jersey, 120 S.Ct. 2348 (2000) and Blakely v. Washington, 2004 WL 1402697 (June 24, 2004) of which the latter was decided after they were convicted and sentenced. The petitioners' conviction became final on November 26, 2003, when the United States Supreme Court denied certiorari. Blakely was issued on June 24, 2004, and Booker was issued on January 12, 2005. Despite the holding in United States v. Booker, 2005 WL 50108 (2005) that Blakely applies to the United States Sentencing Guidelines, the petitioners are not entitled to seek relief as a result of a Blakely violation in this §2255 motion because Blakely and Booker have no retroactive application to petitions for collateral relief. Further, [i]t is settled in this circuit that

7

issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in §2255 Motions." United States v Kalish, 780 F.2d 506, 508 (5th Cir. 1986); accord United States v. Segler, 37 F.3d 1131, 1134 (5th Cir. 1994).

## II.     **UNITED STATES V. BOOKER DOES NOT APPLY HEREIN**

The United States Supreme Court decision in United States v. Booker found certain provisions of the Federal Sentencing Guidelines pursuant to the Sentencing Reform Act of 1984, unconstitutional. The Court first held that the Guidelines violated the defendant's Sixth Amendment right to a jury trial because they require judges to find facts that in turn increase a defendant's sentence beyond what could be imposed based solely on the jury's verdict. U.S. v. Booker, 2005 WL 50108 (2005). In the second part of the decision, the Court considered whether the unconstitutional portions of the Guidelines could be severed and the rest of the statutory scheme preserved. Id. The Court held that by severing the two provisions in the Act that make the guidelines mandatory, the rest of the sentencing scheme could be preserved. Id. Specifically, the court held that 18 U.S.C. § 3553(b)(1) and 18 U.S.C. § 3742(e) were incompatible with the Court's holding. The former provision states that courts "shall impose a sentence within the range" provided by the guidelines. 18 U.S.C. § 3553(b)(1). The latter provision mandated a *de novo* standard of review – a standard that according to the Court depends upon the guidelines' mandatory nature. The Supreme Court continued to make the Guidelines effectively advisory.

In Booker, the defendant was convicted for possession with the intent to distribute of at least fifty grams of cocaine base. U.S. v. Booker 375 F.3d 508, 509 (7th Cir. 2004). Under the Sentencing Guidelines, the sentence authorized by the jury verdict in Booker's drug case was 210-262 month in prison. Id. at 509. At the sentencing hearing, the judge found additional facts

by a preponderance of evidence that mandated a sentence between 360 months and life. Id. The judge gave Booker a 30-year sentence instead of the 21-year, 10-month sentence, sentence he could have received based on the facts proved to the jury beyond a reasonable doubt. Id.

The Sentencing Reform Act requires the court to impose sentences that "reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, [and] protect the public." U.S. v. Booker, 2005 WL 50108. The court must also craft a sentence that "affords adequate deterrence to criminal conduct" and "protects the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(B)&(C). Finally, the court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Even if the petitioners could seek redress for Blakely or Booker violations, they would still fail. The 42-page indictment in this case charged violations of pension, health care and bankruptcy fraud. The Sentencing Guidelines 2000 Edition of the Guideline Manual was used and directed the Probation Officer to the table found at 2F1.1(a). The petitioners, who have the burden of proof herein pursuant to United States v. Scott, 434 F.2d 11 (5th Cir. 1970), did not illustrate how the indictment and verdict did not support such a finding.

Next, the petitioners state that the verdict did not allow the imposition of a sentence beyond 6 months as referenced in the base offense level. The probation officer and the court used a specific offense characteristic of level 14 pursuant to 2F1(b)(1)(O) - loss of more than $5 million but less then $10 million. On September 28, 2001, the jury, in a forfeiture proceeding, answered the question "What amount do you find in United States Currency and all interest and proceeds traceable thereto, as described in B10 of the Indictment, that aggregates to all sums traceable to such property and is therefore subject to forfeiture to the United States." B10 of the

9

forfeiture count stated "SIX MILLION AND 00/100 ($6,000,000) in United States Currency and all interest and proceeds traceable thereto, <u>in that such sum in aggregate is property which was involved in the aforestated offenses</u> or is traceable to such property." The answer the jury gave to that interrogatory was "$6,000,000.00." ( See copy of verdict form, a copy of which is attached as Attachment "A" )(emphasis added). The petitioners allege in their case that government proferred the amount involved for the 14 point enhancement. Clearly the jury verdict proves otherwise.

The loss calculation was also litigated on direct appeal. The court found that the amount of fraud used to calculate the guidelines was $7,324,226. The appeal court upheld the loss amount finding that the conclusion the court made was based upon credibility issues within the discretion of the District Court, specifically, the testimony of a pension plan fiduciary. While the $6 million forfeiture verdict was not the exact amount used in the guideline calculation, it is within the range used by the probation officer and the District Court. Therefore, the petitioners have failed to show actual prejudice.

Petitioners object to the enhancement they received for more than minimal planning or a scheme to defraud more than one victim, a 2-level enhancement. From 1990, when the Herrings created pension plans for their Agencies and HCC, until 1997, when Medicare denied a request for an extension to the Herring's for the payment of their 1996 pension debt because of misdirected available funds to third parties, the Herrings continually planned to and did defraud more than one victim. The petitioners were found guilty of defrauding multiple people and businesses, including Medicare and the Stanford Trust, within that time period. The enhancement was supported by the indictment and evidence.

10

Paragraph 145 of the presentence investigation report involves an enhancement if the offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding. In the indictment, Overt Act 65 of Count 1 set forth testimony of Martha Herring at a bankruptcy proceeding that occurred in October 1996. Overt Act 71 involved a creditors' meeting which occurred on March 31, 1998, attended by both petitioners. Counts 9 - 18 were bankruptcy fraud counts alleging offenses which occurred on March 31, 1998. The petitioners were found guilty of each of the counts associated with the petitioners' conduct at that hearing on that date. The finding of guilty to those counts specifically addressed the enhancement found in Paragraph 145 of the presentence investigation report.

Even in light of Booker, where the Court held that the federal sentencing guidelines are subject to the jury trial requirements of the Sixth Amendment, the sentence imposed on the Herring's survives constitutional challenge. The Supreme Court noted in its decision that the standard for review for violations of the Sixth Amendment is the unreasonableness of the sentence imposed. Id. Petitioners may argue that Booker is substantive because the Court's remedial opinion excised the portions of the sentencing statutes that made the Guidelines mandatory and allowed the imposition of a "reasonable" sentence below the Guidelines sentence. The remedial opinion is not substantive, however, because it does not "alter[] the range of conduct or the class of persons that the law punishes." Schriro v. Summerlin, 124 S.Ct. 2526 (2004).

Even assuming the remedial opinion in Booker is retroactive as a substantive rule, a claim under that rule is not cognizable on collateral review. The Supreme Court also noted that its decision was applicable to all cases on direct review. Id. As noted earlier, the decisions of the District Court and the Court of Appeals in this case were decided before the Booker decision.

The United States Supreme Court must, itself, explicitly make a decision retroactive to cases on collateral review. Sustache - Rivera v. United States, 221 F.3d 8, 11 (1st Cir. 2000). Since the case herein was not pending on direct review when Booker was decided, the Booker decision has no applicability here.

Since Booker, there have been numerous § 2255 motions brought by criminal defendants seeking to have their sentences reduce because of enhancements used by the Sentencing Guidelines. A majority of the cases have held that just like Apprendi and Blakley, that these Sixth Amendment challenges will only apply to cases on direct review. In cases such as U.S. v. Johnson, 2005 WL 170708 (E.D. Va. Jan. 21, 2005) and Gerrish v. United States, 2005 WL 159642 (D. Me. Jan. 25, 2005), the petitioner's § 2255 motions have been rejected based on the direct review application of Booker. If the Supreme Court went out of its way to rule that Booker applies to "all cases on direct review," it has no applicability to the Herrings claim here. Thus, there is no fundamental miscarriage of justice in the imposition of a Guidelines sentence, which is not an unreasonable sentence, and the deprivation of additional judicial discretion to impose a reasonable sentence other than the Guidelines sentence is not fundamentally unfair. United States v. Timmreck, 441 U.S. 780, 783 (1979); Hill v. United States, 456 U.S. 424 (1962).

### III. JOHN AND MARTHA HERRING WERE REPRESENTED BY ABLE AND EFFECTIVE COUNSEL

Petitioners attack the competency of their counsel, Frank Holthaus. The sole basis for the claim of incompetency is the failure of counsel to contest the court's jury instructions; the failure to press constitutional issues before the court; and the failure to contest the misapplication of the sentencing guidelines used by this court. Quite the contrary, the government alleges that

counsel for petitioners actually persuaded the district court to raise the government's standard of proof of the health care and pension frauds.

A. **THE STANDARD**

Under Strickland v. Washington, in order to establish a sixth amendment ineffectiveness claim, . . .[the defendant] must demonstrate that his counsel's performance (1) was seriously deficient and (2) probably affected the outcome of the trial. See Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984) (citations omitted). Failure to establish both deficient performance and prejudice defeats an ineffectiveness claim. See Strickland, 104 S.Ct. at 2071.

This court must bear in mind that courts must narrowly review claims of professionally deficient conduct:

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . .
>
> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.... The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . . [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 689-90, 104 S.Ct. at 2065-66.

B. **PETITIONERS' CLAIM THAT THEIR COUNSEL FAILED TO ARGUE THAT THE JURY INSTRUCTIONS DID NOT INCLUDE THE PROPER INSTRUCTION AS TO 'WILFULNESS'" IS WITHOUT MERIT**

On August 2, 2001, the government filed its requested jury instructions. Included was Instruction No. 9, a copy of which is attached as "B." The instruction stated, in part, that:

> In order to convict the defendants of the charge contained in Count 3 you must find that each defendant committed the following acts beyond a reasonable doubt:
>
> 1. That each defendant knowingly and willfully executed or attempted to execute a scheme or artifice to defraud Medicare;
>
> 2. That as a part of the scheme the defendants obtained money or property or attempted to obtain money or property under the custody or control of Medicare by means of material false pretenses, representations or promises;
>
> 3. That the defendants acted with a specific intent to commit fraud; and
>
> 4. That the scheme was perpetrated against a health care benefit program in connection with the delivery of or payment for health care benefits or services.

To define the term "willfully," the government requested the district court use the Standard Fifth Circuit Jury Instruction found at 1.38 in the 2001 Pattern Jury Instructions:

> The word "willfully," ...means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

On August 28, 2001, days before the start of the trial, counsel for the Herrings filed "Herrings' Instruction No. 1," a copy of which is attached as Attachment "C," which set forth a different definition for "willfulness" as that term was used in the pension and health care fraud context:

> As used in these instructions regarding allegations of Pension Plan Fraud and Medicare Fraud, the term "willfulness" requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."

14

On September 5, 2001, the government opposed the defendants' proposed jury instruction, again requesting the District Court to employ the Pattern Instruction for "willfulness." A copy of that motion is attached as Attachment "D." As the end of the trial neared, the District Court had conferences with counsel from both sides to discuss the jury instructions. At that time, counsel for both sides made their arguments as is customary in criminal trials. The instruction given by the District Court was the result of those conferences. The court's instruction essentially adopted the petitioners' requested instruction:

> "Willful" for purposes of this court means the voluntary and intentional violation of a known legal duty – in this instance, the defendants' fiduciary duties under ERISA. (R.A. p. 2474)...In determining whether the defendants acted with the requisite intent, you may consider whether they willfully and intentionally breached special fiduciary duties imposed by other regulatory statutes or governing instruments. (R.A. p. 2475)...if you find that a defendant was (1) a fiduciary of the employee benefit plans, (2) that the defendant was aware of his or her fiduciary duties with respect to the handling of assets of the employee benefit plans as described in Counts 1 or 2, and (3) that the defendant's unlawful taking of the assets of the employee benefits plans voluntarily and intentionally violated those fiduciary duties, then you may also find that that defendant possessed the criminal intent to deprive the employee benefit plans of the use of their assets and property. (R.A. p. 2478).

The District Court then explained the elements of health care fraud, requiring the knowing and willful execution of a scheme and further described "willful" as the voluntary and intentional violation of a known legal duty.

It would appear from the resulting jury instruction given by the District Court that counsel for the petitioners was most successful in his arguments to define the term "willful" in a manner more advantageous to his clients. In fact, in ruling on this issue, the Fifth Circuit stated that the district court accepted, in principle, the Herrings' suggested "willful," stating that "[e]xcept for an explanation of the nature of the legal duty the government contended the Herrings violated, the court's charge is substantially the same as the one the Herrings requested."

United States v. John Herring and Martha Sewell, No. 02-30533, p. 8 (5th Cir. July 17, 2003). While the Fifth Circuit failed to address the issue further based upon the District Court's decision to use the instruction submitted by the petitioners, the petitioners' motion fails to meet either prong of the Strickland test. The government has demonstrated that counsel for the petitioners was not deficient in his handling of the jury instructions. Instead of a lesser standard of willful being required of the government, as suggested by the Herrings in their motion, the government submits that counsel for the Herrings was able to get the government to prove a higher standard of intent than it ordinarily would have been required to prove. Further, the Herrings have failed to demonstrate how any other instruction would have affected the outcome of the trial.

IV. **PETITIONERS ASSERT ERROR IN THE MANNER IN WHICH RESTITUTION PAYMENTS WERE ORDERED**

A defendant may not raise an issue (constitutional or jurisdictional in nature) for the first time on collateral review without showing both "cause" for his procedural default, and "actual prejudice" resulting from the error." United States v. Segler, 37 F.3d 1131, 1133 (5th Cir. 1994). Alternatively, if a defendant cannot establish "cause" and "actual prejudice," a defendant may be entitled to relief under § 2255 if an error or a constitutional nature would result in a complete miscarriage of justice. United States v. Shaid, 937 F.2d 228, (5th Cir. 1991). Such a miscarriage of justice would result if the error caused the defendant to be convicted of a crime of which he is innocent. Id. None of these showings have been made by petitioners herein.

Further, claims concerning restitution are not cognizable under § 2255 because they relate only to imposition of fine, not to unlawful custody. United States v. Hatten, 167 F.3d 884, 887, (5th Cir. 1999).

16

**WHEREFORE**, the defendant's Motion to Vacate, Set Aside or Correct Sentence should be **DENIED** without an evidentiary hearing.

>JIM LETTEN
>UNITED STATES ATTORNEY
>
>*/s/ Patrice H. Sullivan*
>PATRICE HARRIS SULLIVAN
>Assistant United States Attorney
>Bar Roll No. 14987
>Hale Boggs Federal Building
>500 Poydras Street, Suite 210
>New Orleans, Louisiana 70130
>Telephone: 504/680-3115

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon petitioners by mailing same to each, properly addressed and postage prepaid this 2nd day of February, 2005.

>*/s/*
>Assistant United States Attorney

17